UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHELLE COFER; KEEDRIC M. COFER; CORTEZ JENKINS; TAMEISHA JENKINS; MARLON HESTER, SR.; GERALDINE ANDRE; DJIVENINO ANDRE; and MONIKA GRIFFIN, Individually and on behalf of all others similarly situated,

Plaintiffs,

v.

FINANCIAL EDUCATION SERVICES, INC. D/B/A UNITED WEALTH EDUCATION; AND UNITED WEALTH SERVICES, INC. D/B/A UNITED WEALTH EDUCATION,

Defendants.

_____________________________ /

Case No. 22-12759

F. Kay Behm
United States District Judge

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS IN PART (ECF No. 16) AND REQUIRING THE PARTIES TO SUBMIT TO BINDING ARBITRATION**

## I. PROCEDURAL HISTORY

This case is before the court on Defendants Financial Education Services, Inc. ("FES") and United Wealth Services, Inc.'s ("UWS") motion to dismiss. (ECF No. 16). Plaintiffs Michelle Cofer, Keedric M. Cofer, Cortez Jenkins, Tameisha Jenkins, Marlon Hester, Sr., Geraldine Andre, Djivenino Andre, and Monkia Green ("Plaintiffs") filed a class action complaint on November 14, 2022 alleging

violations of the Michigan Consumer Protection Act, breach of contract, and tortious interference with a business relationship. (ECF No. 1). Plaintiffs filed an amended complaint on March 27, 2023, adding a claim for declaratory judgment. (ECF No. 12). On April 24, 2023, Defendants filed what is labeled a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), but also seeks an order compelling arbitration pursuant to the parties' agreements. (ECF No. 16). This matter is fully briefed, and the court held a hearing on January 24, 2024. (*See* ECF No. 25). For the reasons set forth below, Defendants' motion to dismiss is **GRANTED IN PART.**

## II. FACTUAL BACKGROUND

Defendants FES and UWS are Michigan corporations that do business under the assumed name United Wealth Education ("UWE"). (ECF No. 12, PageID.343). UWE marketed and sold credit repair services and investment opportunities across the United States. *Id.* Plaintiffs were engaged, at all relevant times, as Independent Sales Representatives ("ISRs") with UWE. *Id.*, PageID.345. Plaintiffs allege they marketed Defendants' credit repair services while also recruiting individuals to act as sales agents as part of a multi-level marketing program. *Id.*, PageID.344. Plaintiffs further allege that each sales agent was required to pay an annual fee to Defendants as well as a monthly membership fee to retain their

status. *Id*. Each ISR was allegedly paid based upon their individual sales as well as the sales of those they recruited into the program. *Id*.

The individual plaintiffs allege their relationships with UWE were "ostensibly governed" by an Independent Sales Representative Agreement ("ISR Agreement"), but that they "were not provided copies of the agreement." *Id.*, PageID.345. However, Plaintiffs acknowledge that "the Agreement contains a choice of law provision designating Michigan law as governing the relationship of the parties." *Id*. Plaintiffs also argue that the ISR Agreement "did not [] state how Plaintiffs' commissions and bonuses were to be calculated and paid." *Id.* According to Defendants, the relevant provisions are reflected in the ISR Agreement posted on UWE's website and in the sample ISR Agreement provided to Plaintiffs' counsel. (ECF No. 16, PageID.388).

According to Defendants, in the event of a disagreement between the parties, they specifically agreed that their disputes would be subject to binding arbitration. More specifically ¶ 12, "Dispute Resolution," of the submitted ISR Agreement provides, in part:

> All disputes and claims relating to UWE, its services, the rights and obligations of an Independent Agent and UWE, or any other claims or causes of action relating to the performance of either an Independent Agent or UWE under the Agreement or the UWE Policies and

> Procedures shall be settled totally and finally by arbitration as enumerated in the Policies and Procedures in Farmington Hills, Michigan, or such other location as UWE prescribes, in accordance with the Federal Arbitration Act and the Commercial Arbitration Rules of the American Arbitration Association. Additionally, you agree not to initiate or participate in any class action proceeding against UWE, whether in a judicial or mediation or arbitration proceeding, and you waive all rights to become a member of any certified class in any lawsuit or proceeding.

(ECF No. 16-1, PageID.410, United Wealth Education Independent Sales Representative Agreement). Section 10.3 of the Policies and Procedures includes a similar clause: "If mediation is unsuccessful, any controversy or claim arising out of or relating to the Agreement, of the breach thereof, shall be settled by confidential arbitration administered by the American Arbitration Association…" (ECF No. 16-2, PageID.438, United Wealth Education Statement of Policies and Procedures).

Defendants maintain that each individual Plaintiff agreed to the relevant arbitration provisions on three separate occasions: (1) when they first began their relationship with FES, (2) when their ISR relationships were transferred from FES to UWS in 2021, and (3) upon the restarting of UWS's operations in 2022. (ECF No. 16, PageID.391-92). The exhibits provided in support of Defendants' motion reveal that Plaintiff Michelle Cofer ("Cofer") allegedly agreed to the ISR

Agreement with FES and the corresponding Policies and Procedures on April 22, 2017, at 4:35:35 a.m. (ECF No. 16-3, Independent Sales Agent Application). The other seven Plaintiffs similarly agreed to their own ISR Agreement with FES at various points between 2016 and 2019. (ECF No. 16-4). Although Plaintiffs initially began their relationships with FES, these relationships were transferred to UWS in August 2021. (ECF No. 16, PageID.392). Cofer allegedly entered into the UWS ISR Agreement on August 8, 2021, at 10:41:08 p.m., and each of the remaining seven Plaintiffs came on board with UWS anywhere from August 8 to August 11, 2021. (ECF No. 16-5, 16-6). The Federal Trade Commission (FTC) filed suit against Defendants in May 2022, alleging a variety of violations of federal law. (ECF No. 12, PageID.345). As part of the FTC action, the district court issued a TRO on May 24, 2022, essentially shutting down Defendants' operations, freezing their assets, and appointing a receiver. *Id.*, PageID.346. When the TRO was issued, Plaintiffs allege that Defendants informed their higher-ranking agents, including some of the Plaintiffs, that they did not expect to restart their business operations and "encouraged the agents to seek work elsewhere, including with competing companies." *Id.* As a result, "virtually all" of Defendants' sales agents allegedly sought work elsewhere. *Id.* On July 18, 2022, however, the District Court issued an order overruling the FTC's requests and "Defendants were permitted to

recommence their business operations subject to certain conditions imposed by the Court." *Id.*, PageID.347. Plaintiffs allege that "[m]any of Defendants' former agents, including Plaintiffs, rejoined Defendants, bringing some or all of their agent teams with them." *Id.* Upon restarting their operations, each of the Plaintiffs received a pop-up message requiring them to again agree to the ISR Agreement and incorporated Policies and Procedures. (*See* ECF No. 16-7, screenshot of pop-up message). Cofer allegedly agreed to the new ISR Agreement and Policies and Procedures on August 1, 2022. (*See* ECF No. 16-8, Michelle Cofer Acceptance of New Terms & Conditions/Policies upon Re-opening of UWE on 08/01/2022). The other Plaintiffs allegedly agreed to the identical Policies and Procedures on August 1, 2022, or shortly thereafter. (*See* ECF 16-9, Plaintiffs Acceptance of New Terms & Conditions/Policies upon Re-opinion of UWE on 08/01/2022).

## III. ANALYSIS

Defendants' motion to dismiss makes the following arguments: (1) the court should dismiss Plaintiffs' amended complaint with prejudice because the dispute is subject to a binding arbitration clause; (2) Plaintiffs' claim under the Michigan Consumer Protection Act (MCPA) (Count II) fails because the MCPA does not create a private right of action; (3) Plaintiffs' counts based on a purported

breach of contract (Counts III and IV) should be dismissed because Defendants did not waive the non-compete clause and the ISR Agreement specifically provides that Plaintiffs were not entitled to any further compensation; (4) Plaintiffs' declaratory judgment claim (Count I) should be dismissed because the ISR Agreement specifically provides that Plaintiffs were not entitled to any further compensation; and (5) Plaintiffs' tortious interference claim (Count IV) should be dismissed because the alleged conduct was directly authorized and addressed by the ISR Agreement. (ECF No. 16). The court must first address the question of whether this case is subject to a binding arbitration agreement before resolving any issues on the merits. *See Boykin v. Fam. Dollar Stores of Michigan, LLC*, 3 F.4th 832, 844 (6th Cir. 2021) ("The parties may not address other issues, including merits issues, before the court resolves these formation questions.").

A. Standard of Review

Where a motion seeks to compel arbitration, the court must start by looking at the procedures provided by the Federal Arbitration Act (FAA). *See Proch v. King*, No. 2:22-CV-12141, 2023 WL 4940527, at *2 (E.D. Mich. May 5, 2023), *report and recommendation accepted in relevant part, Proch v. King*, No. 22-12141, 2023 WL 4936695, at *3 (E.D. Mich. Aug. 2, 2023) ("*Boykin* explained that the FAA itself, not the Rules of Civil Procedure, provide the starting point for

determining how a party should invoke the FAA…That is because the FAA supplants conflicting Federal Rules of Civil Procedure."). Under the FAA, a party may enforce an arbitration agreement using one of two mechanisms: "a stay of litigation in any case raising a dispute referable to arbitration" pursuant to 9 U.S.C. § 3, or "an affirmative order to engage in arbitration," pursuant to 9 U.S.C. § 4. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22 (1983). "While § 4 is commonly invoked by plaintiffs who wish to compel breaching parties to cooperate in arbitration, the Supreme Court has held that defendants may also compel arbitration through § 4 after a plaintiff has filed suit in federal court." *Proch*, 2023 WL 4940527 at *2 (citing *Boykin*, F.4th at 837 (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.* 388 U.S. 395, 404 (1967))).

Here, Defendants ask the court to compel arbitration and dismiss this action with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, stay all proceedings pending the completion of arbitration. (ECF No. 16, PageID.394). The court will interpret this as primarily a request to compel arbitration and dismiss this action, rather than a request for a stay, since dismissal is the primary relief sought. Motions to dismiss based on the existence of a valid arbitration agreement are typically governed by § 4 of the FAA, even if § 4 is not cited. 9 U.S.C. § 4; *see also Boykin*, 3 F.4th at 837 ("Family Dollar's motion is best

read as one partially under § 4 because it sought to compel Boykin to arbitrate (although it also sought to dismiss Boykin's complaint and did not cite § 4)"); *Proch*, 2023 WL 4936695 at *2 (finding "[defendant's] 'motion to dismiss' was properly understood as a motion to enforce arbitration under § 4 of the Federal Arbitration Act."). Section 4 of the FAA requires a court to summarily compel arbitration upon a party's request, unless the opposing side has put the making of the arbitration contract "in issue." *Boykin*, 3 F.4th at 835 (citing 9 U.S.C. § 4). An agreement's validity is "in issue" when "the party opposing arbitration ... show[s] a genuine issue of material fact as to the validity of the agreement to arbitrate." *Great Earth Cos. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002). "The required showing mirrors that required to withstand summary judgment in a civil suit." *Id*. Thus, the court views "all facts and inferences drawn therefrom in the light most favorable" to the party opposing arbitration and "determine[s] whether the evidence presented is such that a reasonable finder of fact could conclude that no valid agreement to arbitrate exists." *Id*. If the court finds that the making of the arbitration agreement is "in issue," the court "shall proceed summarily to the trial on the disputed question." 9 U.S.C. § 4. Additionally, "a party who adequately puts the formation of an arbitration contract in issue may request discovery on that contract-formation question." *Boykin*, 3 F.4th at 841.

Alternatively, if the opposing party fails to place the validity of the agreement "in issue," it must be enforced as written. 9 U.S.C. § 4 ("the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement."); *Proch v. King*, 2023 WL 4940527, at *2 ("Simply put, the statute compels parties to honor their arbitration agreements."). While the FAA evidences a "strong federal policy in favor of arbitration," this "does not authorize federal courts to invent special, arbitration-preferring procedural rules. *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022) (citing *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24). As such, arbitrations must be "as enforceable as other contracts, but not more so." *Id.* (citing *Prima Paint Corp.*, 388 U.S. at 404 n.12 ("Accordingly, a court must hold a party to its arbitration contract just as the court would to any other kind."). Here, it is not disputed that, if the Plaintiffs agreed to the relevant arbitration agreement, it covers "[a]ll disputes and claims relating to UWE, its services, the rights and obligations of an Independent Agent and UWE, or any other claims or causes of action relating to the performance of either an Independent Agent or UWE under the Agreement or UWE Policies and Procedures." (ECF No. 16, PageID.390-91). This is broad enough to encompass each of the claims raised by Plaintiffs in their first amended complaint. *Id.*,

PageID.398. As such, if the court determines this agreement is valid, the entire case must be resolved through mandatory arbitration.

B. The *Boykin* Standard

In opposition to Defendants' motion, Plaintiffs argue the court cannot compel arbitration because "there is a legitimate dispute as to whether the parties have an agreement to arbitrate." (ECF No. 20, PageID.688). To determine whether their arguments are sufficient to place the validity of the arbitration agreement "in issue," the court will rely on the standards set forth in *Boykin v. Family Dollar Stores of Michigan, LLC*. In *Boykin*, the Sixth Circuit compared the facts of two different cases to illustrate when a plaintiff has presented sufficient information to create a "genuine dispute" about the validity of an arbitration agreement. 3 F.4th at 840. Generally, the Sixth Circuit found that "convenient memory lapses do not create factual disputes that are genuine" and "[a] party thus cannot expect to obtain a trial under § 4 simply by testifying that the party does not 'remember' signing an arbitration contract or receiving information about an arbitration." *Id.* To illustrate this point, the Sixth Circuit cited *Tinder v. Pinkerton Sec.* In *Tinder*, the plaintiff "argued that she had not accepted arbitration through her employment with Pinkerton Security because she did not receive materials announcing the arbitration policy." 305 F.3d 728 (7th Cir. 2002).

However, the defendant provided evidence that the materials were "definitely sent" to Tinder. *Id.* at 736. Tinder's only evidence in opposition included an affidavit stating that she "did not 'recall' getting them," which was insufficient to create a genuine dispute. *Id.*

On the other hand, the Sixth Circuit held that an "'unequivocal denial' that takes the form of admissible 'evidence' can create a genuine issue of material fact." *Boykin*, 3 F.4th at 840. To illustrate this point, the Sixth Circuit cited *Camara v. Mastro's Restaurants, LLC*. In *Camara*, the plaintiff's employer testified that "virtually every" employee was required to sign the arbitration agreement and Camara's personnel records showed he had, in fact, done so. 952 F.3d 372, 374 (D.C. Cir. 2020). However, Camara testified "he had not seen or signed the agreement and was not aware of any arbitration policy." *Id*. The court found this conflicting evidence, including the question of whether Camara fell within the category of "virtually every employee," necessitated a trial under § 4. *Id.* at 374-75.

The Sixth Circuit noted that the evidence in *Boykin* fell "between the evidence in *Tinder* and *Camara*. *Boykin*, 3 F.4th at 340. Boykin testified that he "does not 'have knowledge or recollection' of accepting the arbitration contract or taking the arbitration session." *Id.* Subject to the penalties for perjury, he

testified: "'I unequivocally did not consent to sign, acknowledge, or authorize any type of arbitration agreement with [Family Dollar] on or after July 15, 2013 or at any time." *Id*. He also "flatly denied receiving information about arbitration: 'I was not informed by [Family Dollar] that I was required to enter into an arbitration agreement as a condition of my employment.'" *Id.* The defendant produced Boykin's personnel file which included "all available records," but did not include any arbitration-related records. *Id.* The Sixth Circuit reasoned that "[t]he 'absence' of these materials from Boykin's personnel file offers some relevant evidence supporting him" and found that "Boykin has identified a genuine dispute of fact over whether the parties have formed a contract – a dispute that entitles him to targeted discovery and a trial on the question." *Id.*

C. Validity of the UWE Arbitration Agreement

As explained in *Boykin*, "to determine whether the validity of an arbitration agreement is 'in issue' under § 4, courts must utilize the summary judgment standard borrowed from Rule 56."[1] *Boykin*, 3 F.4th at 838 (citations omitted)

[1] Defendants argue that Rule 56's standards were only used in *Boykin* because the parties relied on "substantial outside-the-complaint evidence," including a "declaration averring that Boykin had electronically acknowledged the arbitration contract." *Boykin*, 3 F.4th at 838. However, the Sixth Circuit stated that they "need not take a position on [the] issue" of whether Rule 12(b)(6) applies in certain circumstances, and other courts in this district have relied exclusively on Rule 56's standards to determine "whether a court should hold a trial under § 4 when a party alleges that no contract exists." *See Proch*, 2023 WL 4936695, at *3.

("we and many courts have held that Rule 56's standards govern whether a court should hold a trial under § 4 when a party alleges that no contract exists."). Under Rule 56, the key question is whether there is a "genuine dispute as to any material fact" when construing the facts "in the light most favorable to the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Consistent with Rule 56's standards, the party seeking to compel arbitration has the initial burden to present evidence that would allow a trier of fact to find all required elements of a contract, including the Plaintiffs' acceptance. *Boykin*, 3 F.4th at 839 ("Under Rule 56, Family Dollar had the initial duty to present evidence that would allow a trier of fact to find all required elements of a contract"). The court must limit this inquiry to whether a valid agreement to arbitrate exists, not whether the entire contract itself is valid. *Great Earth Cos., Inc.*, 288 F.3d at 889 ("The Supreme Court has explained that in deciding whether a valid agreement to arbitrate exists, district courts may consider only claims concerning the validity of the arbitration clause itself, as opposed to the validity of the contract as a whole).

To determine whether a valid arbitration agreement exists, the court "appl[ies] ordinary state-law principles that govern the formation of contracts." *Chaudhri v. StockX, LLC (In re StockX Customer Data Sec. Breach Litig.)*, 19 F.4th

873, 881 (6th Cir. 2021). The parties do not contest that Michigan law governs the ISR Agreement. (*See* ECF No. 12, PageID.345) ("The Agreement contains a choice of law provision designating Michigan law as governing the relationship of the parties."). Under Michigan law, "an acceptance sufficient to create a contract arises where the individual to whom an offer is extended manifests an intent to be bound by the offer, and all legal consequences flowing from the offer, through voluntarily undertaking some unequivocal act sufficient for that purpose." *Kloian v. Domino's Pizza, L.L.C.*, 273 Mich. App. 449, 453-54 (2006).

As noted above, Defendants' motion includes evidence allegedly showing that the Plaintiffs accepted the ISR Agreement and corresponding Policies and Procedures on three separate occasions: (1) when they first began their relationship with FES, (2) when their ISR relationships were transferred from FES to UWS in 2021, and (3) upon the restarting of UWS's operations in 2022. (ECF No. 16, PageID.392). The court agrees with Plaintiffs that it is not clear which documents and policies form the basis of the contractual relationship as to the first two instances: when the parties filled out their initial Independent Sales Agent agreements and when their relationships were transferred from FES to

UWS.[2] As such, the court will focus on the agreements formed when Plaintiffs returned to UWE in 2022. When UWE's operations were restarted after the TRO was lifted, "each Plaintiff received a pop-up message requiring them to again agree to the ISR Agreement and incorporated Policies and Procedures to continue their relationship with the company." (ECF No. 16, PageID.392). Defendants provided a copy of the relevant portions of this pop-up message, which states: "Our terms and conditions have recently changed. You must take action to be reinstated and resume your Agent benefits. Scroll below to acknowledge the Terms and Conditions **and agree to Policies and Procedures**." (ECF No. 16-7, PageID.568) (emphasis added). The pop-up required the individual to check a box affirming "I have read and consent the changes" and electronically "sign" their name in a box. *Id.* Defendants also provided a copy of the company's "Statement of Policies and Procedures" in effect at the time the parties resumed their ISR status. (ECF No. 16-2, PageID.414) ("Effective February 1, 2022"). These Policies and Procedures include the arbitration provisions at issue. *Id.*, PageID.438 ("10.3

[2] The signed Independent Sales Agent Applications provided in support explicitly state that they are "subject to all the terms and conditions of enrollment attached to or referenced in this application." (*See* ECF No. 16-3, PageID.444). However, it does not appear that the UWE Policies and Procedures or the ISR Agreement were referred to or attached to the Application. Further, Defendants admitted at oral argument that they provided the ISR Agreement and Policies and Procedures to the court as part of Plaintiff Michelle Cofer's initial "packet" of documents (ECF No. 16-3), but they could not say for sure whether those documents were attached at the time she signed the Application.

– Arbitration”). Defendants further provided each of the individual Plaintiffs’ acceptance pages, which include their electronic signature and indicate when they accepted the updated Policies and Procedures. (ECF No. 16-9) (“Acceptance of New Terms & Conditions/Policies upon Re-opening of UWE on 08/01/2022). The acceptance pages include the individual’s name, the date they accepted the terms, the time, and their Agent ID #. *Id.* This information, considered together, is sufficient to meet Defendants’ initial burden to “produce evidence that would allow a reasonable jury to find that a contract exists,” as Plaintiffs manifested their intent to be bound by the Terms and Conditions and Policies and Procedures, which included the relevant arbitration clause. *See In re StockX Customer Data Sec. Breach Litig.*, 19 F.4th at 881.

Because Defendants have met their initial burden to demonstrate a contract exists, the Plaintiffs now have the burden to present “specific facts, as opposed to general allegations,” that would allow a rational trier of fact to find that they did not agree to the arbitration provision. *Boykin*, 3 F.4th at 839. Plaintiffs have not done so. Plaintiffs do not deny their relationships with UWE were governed by an ISR Agreement. (ECF No. 12, PageID.345) (“The relationship between Plaintiff and Defendants was ostensibly governed, to an extent, by an Independent Sales Representative Agreement.”). Additionally, Plaintiffs do not

deny that they returned to work for UWE when operations were restarted in 2022. (ECF No. 20, PageID.681) ("Thus, in August 2022, Plaintiffs returned to Defendants."); (*see also* ECF No. 12, PageID.348, 350) ("When Defendants resumed business operations in August 2022 [M. Cofer; K. Cofer] returned to Defendants."). As it relates directly to the arbitration provision, Plaintiffs never explicitly claim they did not agree to arbitrate, they were unaware of the arbitration agreement, or the arbitration agreement was added after they signed the ISR Agreements. Plaintiffs did not submit any sworn affidavits or other evidence tending to show they did not enter into an agreement to arbitrate. *See Boykin*, 3 F.4th at 840 ("a party might be able to obtain a trial under § 4 with a sworn denial that the party ever signed an arbitration agreement or received arbitration materials."). Instead, Plaintiffs' sole argument challenging the existence or enforceability of the arbitration provision is that they were "not provided copies of their agreements," "Defendants often changed the terms of the Agreement without Plaintiffs' knowledge or consent," and they "cannot be certain whether they actually signed an Agreement with Defendants or which version of the Agreement they signed." *Id.* These allegations do not rise to level of an "unequivocal denial" under *Boykin* and do not place the formation of the contract "in issue." *Id.* at 839 ("on one hand, convenient memory lapses do not

create factual disputes that are genuine…A party thus cannot expect to obtain a trial under § 4 simply by testifying that the party does not 'remember' signing an arbitration contract or receiving information about arbitration.") (citations omitted); *Tinder*, 305 F.3d at 735 (citing *Oppenheimer & Co., Inc. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995)) ("a party cannot avoid compelled arbitration by generally denying the facts upon which the right to arbitration rests; the party must identify specific evidence in the record demonstrating a material factual dispute for trial.").

Because Plaintiffs have failed to put the making of the arbitration agreement "in issue," the court must now dismiss this case and require the parties to engage in arbitration. *See Boykin*, 3 F.4th at 835 (citing 9 U.S.C. § 4). Any remaining questions about the specific terms of the contract Plaintiffs were subject to during all relevant portions of their relationship with UWE must be determined as part of the arbitration proceedings. *Great Earth Cos., Inc.*, 288 F.3d at 890 ("Once the district court determines that a valid agreement to arbitrate exists, challenges to other distinct parts of the contract are to be resolved by the arbitrator.").

## IV. CONCLUSION

Defendants have provided sufficient evidence to support a finding that the parties have a valid arbitration agreement, and all of their relevant disputes are subject to arbitration. As such, under § 4 of the FAA, the court **GRANTS** Defendants' motion to dismiss in part. This opinion should not be construed as a determination on any of Defendants' arguments as to the merits of Plaintiffs' claims. While this order effectively **DISMISSES** this case with prejudice and requires the parties to submit all remaining disputes to binding arbitration, the case will remain open to deal with Defendants' pending motion for sanctions, filed February 14, 2024. (ECF No. 32). Upon resolution of that motion, this case will be closed.

**SO ORDERED**.

Date: March 21, 2024

s/F. Kay Behm
F. Kay Behm
United States District Judge